UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|                                    |   |                    |
|------------------------------------|---|--------------------|
| **FULL SPECTRUM SOFTWARE, INC.,**  | ) |                    |
|                                    | ) |                    |
| **Plaintiff,**                     | ) |                    |
|                                    | ) | CIVIL ACTION       |
| v.                                 | ) |                    |
|                                    | ) | NO. 12-40098-TSH   |
| **FORTE AUTOMATION SYSTEMS, INC.,**| ) |                    |
|                                    | ) |                    |
| **Defendant.**                     | ) |                    |

## ORDER AND MEMORANDUM OF DECISION ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Docket No. 104) AND DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Docket No. 107)

April 21, 2015

**HILLMAN, D.J.**

This action arises out of a commercial dispute between Plaintiff Full Spectrum Software, Inc., ("Plaintiff" or "Full Spectrum") and Defendant Forte Automation Systems, Inc. ("Defendant" or "Forte"). The complaint asserts claims for Breach of Contract (Count I), Quantum Meruit (Count II), violations of M.G.L. c. 93A (Count III), Replevin (Count IV) and Declaratory Judgment (Count V). Plaintiff has moved for summary judgment on Counts I and II with respect to liability only. (Docket No. 104). Defendant has cross-moved for summary judgment on Count III. (Docket No. 107). For the following reasons, both motions are ***denied***.

### Background

Plaintiff Full Spectrum is a Delaware corporation with a principal place of business in Southborough, Massachusetts. Full Spectrum provides software consulting, engineering, and

1

development services for clients in the medical and scientific fields. Defendant Forte is an Illinois corporation with a principal place of business in Machesney Park, Illinois. The company manufactures automated machines, including specialized automated medical equipment.

In 2011, Forte was hired by ProTom International and the McLaren Health Care Corporation to develop a state-of-the-art cancer treatment station that would include automated, software-driven equipment. The project became known as the "InView Project." The final product would be a multimillion dollar piece of equipment used by McLaren Health Care Corporation to treat cancer patients. Forte subcontracted with a company called Civco Medical Solutions to develop and supply custom software for the InView Project. Civco, in turn, subcontracted with Full Spectrum for consulting services associated with the software development. As the InView Project progressed, Forte became concerned about the work of Civco and Full Spectrum, and increased frustrations among the parties ultimately led Civco to terminate its relationship with Forte. This action arises out of the alleged transition of the subcontract for Full Spectrum's services from Civco to Forte.

Full Spectrum asserts that its president, Andrew Dallas, was informed over the weekend of April 14, 2012 that Civco was backing out of the InView project, and that Full Spectrum's work would be transitioned to Forte. Specifically, a Civco representative told Dallas that as of April 16, Full Spectrum should start billing Forte directly for the work they performed. On April 17, Dallas emailed Forte's President, Toby Henderson, as well as Forte project manager Ed Roman, to confirm that Forte would be taking over the cost of Full Spectrum's services. On April 18, Roman responded and informed Dallas that Full Spectrum should continue working on the project as the parties worked out the terms of the contract transition. Full Spectrum continued the work and provided weekly updates to Forte through the end of April. During this time no one

from Forte told Full Spectrum to stop working on the software.

Forte understands this transition period differently. Forte asserts that it was reluctant from the beginning about the prospect of taking over the Full Spectrum contract. According to Toby Henderson, Forte communicated with Full Spectrum during the final two weeks of April merely to gain an understanding of the scope, cost, and value of the services Full Spectrum could offer. He asserts that Ed Roman did not have the authority to instruct Full Spectrum to continue working. Henderson believed that Full Spectrum continued to work on the software to demonstrate the current status of the software and convince Forte that it was capable of completing the project.

On May 2, representatives from Forte traveled to Massachusetts to meet with Full Spectrum. Full Spectrum characterizes the meeting as an effort to finalize details of the software development already in progress. Forte, conversely, describes the meeting as an opportunity for Full Spectrum to make a presentation on the current status of the software. At the conclusion of the meeting on May 3, Henderson signed a "Consulting Services Agreement" ("CSA") at the request of Full Spectrum.

The CSA states that "Full Spectrum shall perform the service for the project identified on the Work Order which is attached hereto," and provides that Full Spectrum must perform the project "in accordance with the description of such services in the attached Work Order." However, the parties did not complete a work order at that time. Instead, Full Spectrum sent a proposed work order to Forte a week later, along with updated cost estimates. The new figures estimated the completed software development project would cost Forte up to $671,780—nearly double the original estimate by Civco. Taken aback by the new figures, Forte did not complete the work order despite repeated requests from Dallas to let him know "where things stand." On

May 14, fearing that his company was being taken advantage of, Dallas informed Forte that Full Spectrum would cease work on the software. The parties were unable to reach any subsequent agreement.

Full Spectrum billed Forte $133,053.75 for software development services performed between April 16, 2012 (the date that Civco terminated its involvement with the InView Project) and May 14, 2012 (the date that Full Spectrum ceased work on the InView Project). Forte has not paid any of the outstanding balance.

## Discussion

### *Summary Judgment Standard*

Federal Rule of Civil Procedure 56 provides that the court shall grant summary judgment if the moving party shows, based on the materials in the record, "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute precludes summary judgment if it is both "genuine" and "material." *See Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48, 106 S.Ct. 2505 (1986). An issue is "genuine" when the evidence is such that a reasonable factfinder could resolve the point in favor of the non-moving party. *Morris v. Gov't Dev. Bank*, 27 F.3d 746, 748 (1st Cir. 1994). A fact is "material" when it might affect the outcome of the suit under the applicable law. *Id*.

The moving party is responsible for "identifying those portions [of the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548 (1968). It can meet this burden either by "offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the non-moving party's case.'" *Rakes v. U.S.*, 352 F. Supp. 2d 47, 52 (D. Mass. 2005) (quoting *Celotex*, 477 U.S. at 4). Once the moving party shows the absence of any disputed

material fact, the burden shifts to the non-moving party to place at least one material fact into dispute. *See Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir. 1994) (discussing *Celotex*, 477 U.S. at 325). When ruling on a motion for summary judgment, "the court must view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Scanlon v. Dep't of Army*, 277 F.3d 598, 600 (1st Cir. 2002).

*Plaintiff's Motion for Partial Summary Judgment on Counts I & II*

*Count I: Breach of Contract*

Count I alleges that Forte breached its contract with Full Spectrum by failing to pay Full Spectrum the sum of $133,053.75 for software development labor and services. To establish a breach of contract under Massachusetts law, a plaintiff must show "that there was a valid contract, that the defendant breached its duties under the contractual agreement, and that the breach caused the plaintiff damage." *Guckenberger v. Boston Univ.*, 957 F. Supp. 306, 316 (D. Mass. 1997). Full Spectrum moves for summary judgment on the question of liability only, conceding that genuine and material factual disputes exist on the question of damages. Plaintiff's argument proceeds under two theories: (1) that the CSA constitutes an express written contract binding on the parties; and (2) the conduct of the parties created an implied-in-fact contract.

Whether the CSA constitutes an express written contract

The parties each assert threshold arguments that the other should be judicially estopped from taking its current position on the CSA. Full Spectrum argues that because Forte sued Full Spectrum for breach of contract in U.S. District Court for the Southern District of Iowa—a claim based on the CSA—Forte should be judicially estopped from asserting in this Court that the CSA is not a contract. Conversely, Forte asserts that because Full Spectrum argued that the CSA is not a contract at the motion-to-dismiss stage of *this* action, Full Spectrum should be estopped from

now claiming that it is.[1] The equitable doctrine of judicial estoppel is ordinarily applied to "prevent[] a litigant from pressing a claim that is inconsistent with a position taken by that litigant either in a prior legal proceeding or in an earlier phase of the same legal proceeding." *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 32-33 (1st Cir. 2004) (quoting *InterGen N.V. v. Grina*, 344 F.3d 134, 144 (1st Cir. 2003)). There are two primary conditions for the application of judicial estoppel: (1) the previous position and the newly pressed claim must be directly inconsistent; and (2) the "responsible party must have succeeded in persuading a court to accept its prior position."[2] *Id.* at 33.

The judicial estoppel arguments for each party fail because neither this Court nor the Southern District of Iowa was persuaded to accept the parties' prior positions on the enforceability of the CSA. With respect to the Iowa action, the District Judge never concluded that the CSA was an enforceable contract. Although the court's Order of October 4, 2013—which dismissed Forte's third-party complaint against Full Spectrum—references a "contract" and an "agreement," that language merely describes the allegations of the Forte complaint. *See* Docket No. 45 at 4-6. The ruling did not reach the merits of whether the CSA was enforceable, but instead dismissed the action without prejudice pending the result in *this* case. *See id*. Similarly, Full Spectrum's prior argument that the CSA is not enforceable, asserted at the motion-to-dismiss stage in this action, did not persuade this Court. To the contrary, this Court refused to enforce the CSA's forum selection clause because it was *unclear* whether the CSA

---

[1] Forte previously sought to enforce the forum-selection clause contained in the CSA, which would have required this Court to transfer the case to the Northern District of Ohio. *See* Docket No. 16. Seeking to avoid litigating in Ohio, Full Spectrum's opposition to the motion to dismiss asserted that the CSA did not constitute an enforceable contract. *See* Docket No. 23.

[2] A third oft-considered factor asks "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire v. Maine*, 532 U.S. 742, 751, 121 S.Ct. 1808 (2001). Because neither party succeeded in persuading a court to accept its prior position, it is unnecessary for the Court to reach this factor.

6

constituted a binding contract at that early stage of the litigation. *See* Docket No. 25, at 4. Accordingly, the Court declines to invoke judicial estoppel and now turns to the merits of whether the CSA is an enforceable written contract.

"It is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement." *Situation Mgmt. Sys., Inc. v. Malouf, Inc.*, 430 Mass. 875, 878, 724 N.E.2d 699 (2000). It is not required that all terms of the contract be precisely specified, but the parties must have progressed beyond the stage of imperfect negotiation. *Id.* "[T]he failure to reduce uncertainties to definite terms [can be] fatal, particularly where parties have not yet formalized their negotiations or have left essential terms completely open." *Lafayette Place Assocs. v. Boston Redev. Auth.*, 427 Mass. 509, 517, 694 N.E.2d 820 (1998).

Applying these principles to the present case, the Court finds that the CSA does not constitute an enforceable written contract. The CSA is a boilerplate document designed to incorporate a particular project's material terms in "the attached Work Order." *See* Consulting Services Agreement, Docket No. 106, Ex. A2 at 84. However, it is undisputed that a work order was never completed. While certain important terms, like Full Spectrum's billing rate, are included in the CSA, *see id.* at 84, 88, no details regarding the specific project that Full Spectrum was hired to complete are contained in the document. *See id.* at 84-88. There is no mention of the scope of the work Full Spectrum would perform, the nature of the work product, or the date by which it would be completed. *See id.* The absence of such essential terms from the CSA and the lack of a completed work order indicate that the parties never moved past the negotiation stage. Consequently, the CSA is not enforceable.[3] *See, e.g.*, *PSMG Int'l, Inc. v. Nodine's Smokehouse,*

---

[3] Full Spectrum also argues that it is entitled to attorney's fees and costs pursuant to Paragraph 8 of the CSA. Because the Court finds the CSA to be unenforceable, this issue is moot.

*Inc.*, No. 08-CV-10269-RGS, 2009 WL 3679288, *2-3 (D. Mass. 2009) (finding contract to be unenforceable where the written document did not set forth "many of the essential terms" necessary to ascertain the obligations of the parties).

Whether the conduct of the parties created an implied contract

Alternatively, Plaintiff asserts that the conduct of the parties established an implied-in-fact contract. "In the absence of an express agreement, a contract implied in fact may be found to exist from the conduct and relations of the parties." *LiDonni, Inc. v. Hart*, 355 Mass. 580, 583, 246 N.E.2d 446 (1969). To prove that an implied contract was formed, a plaintiff must show "that there was a benefit to the defendant, that the plaintiff expected the defendant to pay for that benefit, and that the defendant expected, or a reasonable person should have expected, that he or she would have to pay for that benefit." *T.F. v. B.L.*, 442 Mass. 522, 526-27, 813 N.E.2d 1244 (2004). Where a defendant was aware or should have been aware of the plaintiff's expectations, a failure to object can create an enforceable contract. *Id.* "The defendant's subjective intent is not relevant if she knows or has reason to know that her objective actions manifest the existence of an agreement." *Id.* (citing Restatement (Second) of Contracts § 19 (1981)).

In this case, the implied-contract inquiry implicates a complex set of communications and conduct between multiple individuals, employed in various capacities by Forte, Civco, and Full Spectrum, regarding the transition of the contract to Forte and whether Full Spectrum should continue to work on the project. The significance and effect of the parties' conduct are fact-specific determinations fit for a jury. For example, Forte President Toby Henderson maintains that Forte never used any of the work generated by Full Spectrum from April 16 to May 14 of 2012. *See* Henderson Dep. Pt. 1, Docket No. 108, Ex. B. at 37:22-38:22. A reasonable juror could credit this testimony and conclude that no benefit was conferred on the defendant.

Similarly, a reasonable jury could find that Forte did not expect—nor should have expected—that it would have to pay for Full Spectrum's services. Although there is evidence that Forte project manager Ed Roman told Full Spectrum to continue working on the InView Project, Henderson asserts that Roman was not authorized to give such an instruction. *See* Henderson Dep. Pt. 1 at 25:5-26:9. Henderson further states that he was never under the impression that Forte would assume responsibility for Full Spectrum's work, and that he promptly expressed his concerns about Full Spectrum's ability to complete the project once Civco backed out. *Id.* at 22:2-12; Henderson Dep. Pt. 2, Docket No. 108, Ex. C at 22:2-21; 30:7-12. Forte employee Scott Alcock testified at his deposition that the purpose of Forte's visit to Full Spectrum in early May was for Full Spectrum to make a presentation to Forte on the current status of the software. *See* Alcock Dep., Docket No. 108, Ex. E at 12-13. This comports with Henderson's understanding that the parties were engaged in negotiations, but ultimately did not reach a deal. *See* Henderson Dep. Pt. 2 at 23:17-24:8. A factfinder could credit this evidence and conclude that Forte reasonably did not expect that it would have to pay for the work performed by Full Spectrum from April 16 to May 14.

Viewing the record in the light most favorable to Forte, there exist genuine issues of material fact on the question of whether the parties' conduct created an implied contract. Therefore, Full Spectrum's motion for partial summary judgment on Count I will be denied.[4]

*Count II: Quantum Meruit*

Count II asserts that Full Spectrum is entitled to recover under a theory of quantum meruit. Quantum meruit "is a claim independent of an assertion for damages under the contract, although both claims have as a common basis the contract itself." *J.A. Sullivan Corp. v.*

---

[4] As the Court finds that the CSA does not constitute an enforceable contract as a matter of law, the issue of liability on Count I will proceed to the jury only on the implied-contract theory.

*Commonwealth*, 397 Mass. 789, 793, 494 N.E.2d 374 (1986). "The underlying basis for awarding quantum meruit damages in a quasi-contract case is unjust enrichment of one party and unjust detriment to the other party." *Salamon v. Terra*, 394 Mass. 857, 859, 477 N.E.2d 1029 (1985) (quoting 1 A. Corbin, Contracts § 19 (1963)). To recover under quantum meruit, Full Spectrum must show: "(1) that it conferred a measurable benefit upon the defendants; (2) that the claimant reasonably expected compensation from the defendants; and (3) that the defendants accepted the benefit with the knowledge, actual or chargeable, of the claimant's reasonable expectation." *Finard & Co., LLC v. Sitt Asset Mgmt.*, 79 Mass. App. Ct. 226, 229, 945 N.E.2d 404 (2011).

The Court finds that summary judgment is also precluded on the quantum meruit claim. As described above, there is evidence that Forte never used the work performed by Full Spectrum from April 16 to May 14. *See* Henderson Dep. Pt. 1 at 37:22-38:22. This creates a fact dispute about whether Full Spectrum conferred a measurable benefit on Forte, and whether Forte accepted a benefit with knowledge of Full Spectrum's expectation of payment. These issues are material to recovery under a theory of quantum meruit. Full Spectrum's motion for partial summary judgment will therefore be denied on Count II.

### *Defendant's Motion for Partial Summary Judgment on Count III*

Forte has cross-moved for summary judgment on Count III, which alleges a violation of M.G.L. c. 93A for unfair and deceptive business practices. Chapter 93A proscribes "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." M.G.L. c. 93A, § 2. A practice is unfair if it falls "within the penumbra of some common-law, statutory, or other established concept of unfairness; is immoral, unethical, oppressive, or unscrupulous; and causes substantial injury to other businessmen." *Linkage Corp.*

*v. Trs. of Boston Univ.*, 425 Mass. 1, 27, 679 N.E.2d 191 (1997) (internal alterations omitted). The familiar maxim is that the conduct "must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 185 (1st Cir. 2009). Where, as here, a business seeks relief under § 11 of the statute, courts apply "a stricter standard than [it would for individual] consumers in terms of what constitutes unfair or deceptive conduct." *Giuffrida v. High Country Investor, Inc.*, 73 Mass. App. Ct. 225, 238-39, 897 N.E.2d 82 (2008).

To be sure, much of the evidence in the record suggests that the parties' dispute stems from no more than a failed business negotiation or a run-of-the-mill breach of contract. Chapter 93A case law makes clear that failed negotiations or breaches of contract are not sufficient to establish an actionable claim under 93A. *See Pappas Indus. Parks, Inc. v. Psarros*, 24 Mass. App. Ct. 596, 600, 511 N.E.2d 621 (1987) (observing that it is not unfair or deceptive "to break off incomplete and imperfect negotiations of a commercial agreement"); *Framingham Auto Sales, Inc. v. Workers' Credit Union*, 41 Mass. App. Ct. 416, 418, 671 N.E. 2d 963 (1996) (observing that "a mere breach of a legal obligation under commercial law, without more, does not amount to an unfair or deceptive act" under 93A).

Nonetheless, whether an act or practice is "immoral, unethical, oppressive or unscrupulous" is the kind of fact-specific determination best left for a jury. *See, e.g.*, *First Choice Armor & Equipment, Inc. v. Toyobo America, Inc.*, 839 F. Supp. 2d 407, 415 (D. Mass. 2012) (denying summary judgment on plaintiff's 93A claim "[b]ecause [the unfair or deceptive practice] inquiry is fact-intensive"). There is evidence that Forte encouraged Full Spectrum to continue working while the parties engaged in protracted negotiations about the software development project. *See* Roman Dep., Ex. D, 28:12-18; Henderson Dep. Pt. 2, Ex. C, 23:17-

24:8. There is also evidence that, from the outset, Forte entertained serious doubts about whether it would hire Full Spectrum. *See* Henderson Dep. Pt. 2, Ex. C, 30:13-31:8. Drawing all reasonable inferences in Full Spectrum's favor, a factfinder could conclude that Forte strung Full Spectrum along for its own benefit, despite having no real intention to compensate Full Spectrum for its services. A reasonable jury could find such conduct to be unfair or deceptive under Chapter 93A. *See Costa v. Brait Builders Corp.*, 463 Mass. 65, 972 N.E. 2d 449 (2012) (concluding that a reasonable jury could find an unfair or deceptive act where the defendant allegedly engaged in a scheme to obtain benefits from a subcontract without paying for them). Because a genuine and material fact dispute exists with respect to the 93A claim, the Court will deny Forte's motion for summary judgment on Count III.

## Conclusion

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment (Docket No. 104) is ***denied*** for both Count I and Count II. Defendant's Motion for Partial Summary Judgment (Docket No. 107) on Count III is ***denied***.

**SO ORDERED.**

                                            ***/s/ Timothy S. Hillman***
                                            **TIMOTHY S. HILLMAN**
                                            **DISTRICT JUDGE**